THE CHATTOOGA CONSERVANCY, Florida Biodiversity Project, Forest Conservation Council, Georgia Forest-Watch, Ouachita Watch League, Sierra Club, Southern Appalachian Biodiversity Project, Wild Alabama, Wild South, and The Wilderness Society, Plaintiffs

v.

Robert T. JACOBS, as Regional Forestor of the Southern Region of the U.S. Forest Service, and the U.S. Forest Service, Defendants

No. CIV.1:01 CV 1976–ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 13, 2004.

Blaine T. Phillips, Charlottesville, VA, Donald D.J. Stack, Jonathan Lee Schwartz, Stack & Associates, Atlanta, GA, Douglas A. Ruley, Southern Environmental Law Center, Inc., Asheville, NC, Eric Huber, Sierra Club, Boulder, CO, Martin J. Bergoffen, Southern Appalachian Biodiversity Project, Asheville, NC, Ray Vaughan, WildLaw, Montgomery, AL, for Plaintiffs.

Pamela S. West, U.S. Department of Justice, Environmental & Natural Resources Division, General Litigation Section, Washington, DC, Robert David Powell, Office of United States Attorney, Northern District of Georgia, Atlanta, GA, for Defendants.

## ORDER

EVANS, District Judge.

This civil action in which Plaintiffs, various environmental organizations, contend that Defendants, Robert T. Jacobs, Regional Forestor for the Southern Region of the U.S. Forest Service, and the U.S. Forest Service (the "Forest Service"), have acted in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331–4337, and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.,* is before the Court on the Plaintiffs' Motion for a Temporary Restraining Order and for a Preliminary Injunction [# 33]. Plaintiffs seek to enjoin site preparation and timber harvesting activities at two locations in the Ouachita National Forest [1]— Wildhorse Creek (in Oklahoma) and Oliver Branch (in Arkansas). A hearing was held on January 5, 2004, at which time the Court received evidence and heard arguments of counsel. Both sides have filed briefs. Upon consideration, Plaintiffs' Motion is DENIED.

## I. *Factual Background*

In March 1990, Defendants issued a Final Environmental Impact Statement for Vegetation Management in the Ozark/Ouachita Mountains ("FEIS") that analyzed the relative impact of various vegetation management strategies on the environ-ment in the National Forests of Arkansas and Oklahoma—specifically the Ozark–St. Francis and Ouachita National Forests. The FEIS considered the potential impact of herbicide use, prescribed fire, mechanical methods, manual methods and biological methods. It concluded that biological methods and aerial herbicides would not be used. The other methods of vegetation management were approved, subject to the general qualification that a project utilizing these methods must be preceded by a site-specific evaluation, which would determine whether the proposed vegetation management measures would affect threatened, endangered or sensitive plant and animal species, hereinafter "PETS" or "protected species", in the proposed treatment area. Specifically, the FEIS provided in pertinent part:

1. General Management Requirements and Mitigation Measures

a. Site–Specific Analysis

The following general requirements and measures apply to vegetation management methods. Each forest may be more restrictive, but not less.

(1) Projects must have site-specific analysis in compliance with the National Environmental Policy Act (NEPA).

\*      \*      \*      \*      \*      \*

(2) A biological evaluation of how a project may affect any species Federally listed as threatened, endangered, or proposed, or identified by the Forest Service as sensitive, is done by a biologist as part of the site-specific environmental analysis. This evaluation considers all available inventories of threatened, endangered, proposed, and sensitive species populations and their habitat for the proposed treatment area. *When adequate population inventory information*

---

**1.** The Ouachita National Forest is located in U.S. Forest Service Region Eight, also known as the Southern Region. The Southern Region includes Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, Oklahoma, Puerto Rico, South Carolina, Tennessee, Texas and Virginia. Its headquarters is in Atlanta, Georgia.

*is unavailable, it must be collected when the site has high potential for occupancy by a threatened, endangered, proposed, or sensitive species.* Appendix D identifies potential adverse effects from vegetation management by species. When adverse effects are projected, mitigation measures specified in appendix D and this chapter are used to prevent them. Requirements and measures for actions affecting U.S. Fish and Wildlife Service threatened, endangered, or proposed species are detailed in species recovery plans and FSH 2609.23R. Recovery plans have been prepared for the red-cockaded woodpecker, southern bald eagle, northern bald eagle, gray bat, Indiana bat, eastern cougar, Florida panther, American peregrine falcon, American alligator, and the leopard darter. Chapters in FSH 2609.23R have been prepared for red-cockaded woodpecker, southern bald eagle, and American alligator. Requirements and measures for actions affecting sensitive species are detailed in Forest Land and Resource Management Plans.

FEIS, II–40 and II–41 (emphasis added).

The FEIS described each of the vegetation management methods and noted that the mechanical method's major use was "roadside maintenance and even age site preparation." FEIS, II–11. The manual method was stated to occur "mostly in timber stand improvement, site preparation, wildlife habitat improvement and trail and roadside maintenance." *Id.* The terms "mechanical" and "manual methods" do not appear to refer directly to commercial timber harvest, but rather to activities that may (and perhaps usually do) accompany a commercial timber harvest.[2]

The FEIS also pointed to the requirement of consultation with the U.S. Fish and Wildlife Service, state wildlife agencies, natural heritage commissions, and other cooperators or species authorities before proceeding with a project that might affect threatened endangered or proposed species. FEIS, II–41 to II–42.

Also in March 1990, the Forest Service issued an Amended Land and Resource Management Plan ("Forest Plan")[3] for the Ouachita National Forest.[4] Unlike the FEIS, a significant portion of the Forest Plan is devoted to issues surrounding timber production. Chapter IV of the Forest Plan describes goals and objectives for forest management, and contains a physical description of each of the twenty man-

**2.** The term "timber stand improvement" is defined in the FEIS Glossary so as to include "pre-commercial thinning". *See* FEIS Glossary, VII–8. "Pre-commercial thinning" is defined so as to state that the felled trees are not removed from the forest. *See id.* VII–6.

**3.** A Forest Plan, technically called a Land and Resource Management Plan, is a broad, programmatic document that coordinates the management of "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). Each National Forest is required to have a Forest Plan.

**4.** According to a 1990 map, the Ouachita National Forest includes 1,591,849 acres of land which is geographically divided into the following Ranger Districts: Cold Springs, Fourche, Winona, Jessieville, Mena, Oden, Womble, Poteau, Choctaw, Kiamichi, Tiak, Caddo.

The Ranger Districts are in turn geographically divided into "compartments" and sometimes further divided into subcompartments. These units further are divided into numbered "stands", normally groups of trees which may cover a large or small number of acres. Proposed projects in the forest usually designate the numbered compartments, numbered stands and the total number of acres within each stand to be treated or harvested.

Documents pertaining to the 2002 Wildhorse Creek Project suggest that the Ranger Districts in Oklahoma have been consolidated into the Oklahoma Ranger District, which has units designated as the Choctaw, Kiamichi, Tiak, and Broken Bow units.

agement areas of the forest.[5] The Forest Plan incorporated the vegetation management choices made in the 1990 FEIS. It specified the protected species believed to live in the Ouachita National Forest, including the red cockaded woodpecker, the bald eagle, the Bachman sparrow, and the Ozark Chinquapin. *See* Forest Plan, I–3. Chapter IV discusses each of the protected species, noting their locations by Ranger District within the forest. *See id.* IV–39 to IV–45. As to certain of the protected species, the Forest Plan contained estimated population numbers (*e.g.*, red cockaded woodpecker, bald eagle). *See id.* As to the Indiana bat, the Forest Plan noted: "Recent studies of the Forest's bat fauna have been completed in both Arkansas and Oklahoma. These studies included extensive mist netting of riparian areas and examination of known caves and abandoned mining drifts. Neither species was found." *Id.* IV–41. However, the Forest Plan also acknowledged that the Indiana bat might "possibly occur on Forest lands during the maternity period, May–August". *Id.* The Plan noted that the Ozark Chinquapin, "[a] tree endemic to the Interior Highlands of Arkansas and adjacent states, occurs in both the Arkansas and Oklahoma portions of the Forest. Largely depleted by the fungus (Endothia Parasitica) that caused the Chestnut Blight, most specimens consist of stump sprouts which persist but usually die before reaching maturity." *Id.* IV–45.

On March 5, 1990, two Records of Decision ("RODs") were signed by the Regional Forester for Region Eight. One is titled "Record of Decision–USDA Forest Service–Final Environmental Impact Statement—Vegetation Management in the Ozark/Ouachita Mountains." Attached to this ROD are several exhibits. Exhibit A is entitled "Management Requirements and Mitigation Measures" required by the FEIS as to Proposed Endangered, Threatened and Sensitive Species ("PETS") and sets forth, inter alia, the site-specific PETS data collection requirement. *See* FEIS ROD, A–1. Exhibits B and C are two documents labeled as Amendments 3 and 4 to the "Ozark–St. Francis National Forests Land and Resource Management Plan".[6] *Id.* B–1 and C–1. They both pertain generally to mitigation measures, but are difficult to interpret as the underlying documents to which they refer are not in the record. Nonetheless, both sides appear to agree that Exhibits B and C are amendments to the Forest Plan which make the same PETS data collection requirements as those in the FEIS applicable to the Forest Plan. Therefore, the Court will proceed based on this assumption.

The other ROD is titled "Record of Decision–Ouachita National Forest Final Supplement [7] to Final Environmental Impact Statement and the Amended Land and Resource Management Plan." As noted, it was also signed on March 5, 1990, by the Regional Forester. This document does not separately refer to the PETS data collection which the FEIS called for when vegetation management strategies

---

5. A management area is not necessarily a discrete location, but rather is a type of area having certain physical characteristics and which is assigned certain management goals. Thus, numerous areas within a National Forest may be assigned the same management area number. Apparently, new management areas have been created since 1990.

6. The ROD for the 1990 FEIS states: "To implement this programmatic environmental impact statement, Forest Plans for the Ozark–St. Francis and Ouachita National Forests are being amended (exhibits B and C) by *this* Record of Decision". FEIS ROD, at 16 (emphasis added). In other words, the ROD for the FEIS effected an amendment of the Ouachita National Forest Plan.

7. Apparently, the 1990 FEIS was amended with a final supplement in 1990. This document is not in the record.

are employed, although it does recognize the management direction of the FEIS as applied to the Forest Plan.

In *Sierra Club v. Martin,* 168 F.3d 1 (11th Cir.1999), the United States Court of Appeals for the Eleventh Circuit addressed this same PETS language, which was contained in a Forest Plan for the Chattahoochee National Forest, and held that the Forest Service violated the Chattahoochee Forest Plan by implementing a logging and road construction project in the absence of "adequate population inventory information" on PETS when the proposed site had a high potential for occupancy by PETS. *Id.* at 5. The *Martin* court found that because the Forest Service acted contrary to its own Forest Plan in proceeding without "adequate population inventory information", its actions in approving the projects were arbitrary and capricious.

After the *Martin* decision, several national forests in the Southern Region, including the Ouachita National Forest, amended their Forest Plans. Amendment 31 to the Ouachita Forest Plan changed the PETS language so as to drop use of the term "inventory" and to make the acquisition of pre-project, additional PETS data more clearly discretionary with the Forest Service:

During the biological process to identify possible effects, existing available information will be used to determine the PETS species known or expected to occur in the vicinity of the proposed project or likely to be affected by the action. The information considered may include data on species/habitat relationships, species range distribution, and population occurrences developed from past field surveys or observations. Existing available information considered will also include the amount, condition, and distribution of suitable habitat.

For some PETS species expected to occur in the vicinity of the project, or likely to be affected by the project, additional field surveys conducted in suitable habitat that is potentially affected by the proposed project are desirable to document the presence or absence of these species. These field surveys would be most appropriate if past field surveys are not available for such areas and if they would provide more definitive information to improve the determination of effects to PETS species.

However, there are some PETS species and situations where information to determine potential effects to PETS species may not require field surveys. For these situations, the PETS species in question would be assumed to occur in the area if suitable habitat is present, and effects to the species would be considered in the effects analysis. These situations occur when:

1. There is a low likelihood of detecting a particular species; a field survey probably would not find that species and therefore could not provide definitive information for excluding a species being considered for protection.

2. Established Forest Plan direction or mitigation that effectively protects PETS species expected to occur in suitable habitat in the project vicinity is already in place and is part of the proposed action.

Decision Notice, Amendment 31, at 2. This Amendment was signed by the Forest Supervisor on July 12, 2000. He found that Amendment 31 was not a significant change to the Forest Plan. He noted that the Amendment was intended to clarify the Forest Service's management direction for conducting biological evaluations for proposed projects within the Ouachita National Forest. He specifically referred to

the Eleventh Circuit's interpretation of the language regarding the PETS data requirement in the FEIS and the Forest Plan in the *Martin* case and noted that the existing PETS language did not support the Forest Service's intent or its view of the proper scientific methodology to be followed.

In connection with Amendment 31, an environmental assessment ("EA") was prepared after soliciting the views of 532 interested persons. The EA determined that the amendment would have no significant impact on humans or protected species. Notice of the Amendment and notice of right to appeal was published in the *Arkansas Democrat/Gazette* in Little Rock, Arkansas. Notice of appeal was due within 45 days of date of publication. The record herein does not reflect whether any appeals were filed, and the Court assumes that none were.

At some time after 1990, the Regional Forester for Southern Region determined that the Diana Fritillary (an insect/butterfly) and the American Burying Beetle should be added to the Region's list of sensitive species.

Plaintiffs filed their complaint on July 26, 2001 and alleged that Amendment 31 to the Ozark/Ouachita Forest Plan was invalid in that it was inconsistent with the 1990 FEIS' requirement that management and mitigation measures in the Forest Plan be at least as restrictive as those in the FEIS.

In August of 2001, Defendants published a notice of their intent to supplement the 1990 Ozark/Ouachita FEIS so as to delete the reference to a pre-project inventory of PETS population. Defendants also gave Notice of their intent to amend the Forest Service Manual for the Southern Region to effect a similar revision. The amendment to the Forest Service Manual was effective March 7, 2002. It retained the requirement of a pre-project PETS inventory only where: 1) vegetative management techniques in a particular project would have adverse effects on PETS occupants assumed to be present, 2) further information on the number and location of PETS would improve the effectiveness of mitigation efforts to reduce adverse effects, or allow better assessment of effect on the viability of the population, 3) no current site-specific inventory of PETS occupants existed, *and* 4) feasible and effective inventory methods for the PETS assumed to be present existed. Forest Service Manual, Southern Region, Supp. No. R8–2600–2002–2.

A 2002 supplement to the 1990 Ozark/Ouachita FEIS was published in a ROD on October 25, 2002. This supplement stated "the vegetation management activities covered by the FEIS include herbicide use, prescribed fire and mechanical site preparation, but do not include commercial timber harvesting." FEIS ROD, October 2002. Regarding the pre-project PETS evaluation, the supplement stated:

> A biological evaluation of how a project may affect any species Federally listed as threatened, endangered or proposed, or identified by the Forest Service as sensitive *shall be* done as part of the site-specific environmental analysis. This evaluation considers available *information on* threatened, endangered, proposed, and sensitive species populations and their habitat for the proposed treatment area.

*Id.* (emphasis in original). The effect of the 2002 supplement to the Ozark/Ouachita FEIS was to delete mention of PETS "inventory" or further collection of PETS data and to state that "available [PETS] information" should be considered.

The October 25, 2002, Record of Decision also contained a notice that the Ouachita Forest Plan had been amended so as to delete the language of Amendment 31 (which had emphasized guidelines for col-

lecting new PETS data but also made the decision to collect new data more clearly discretionary) and to replace it with Amendment 35, which simply stated that "available information" on the presence of PETS occupants should be considered. *Id.* Both the supplement to the FEIS and Amendment 35 state an effective date of November 15, 2002.

Plaintiffs amended their complaint in July of 2003, alleging in part that the approvals of timber sales at the two project sites within the Ouachita National Forest—the Wildhorse Creek Project and the Oliver Branch Project—were unlawful because of Defendants' failure to inventory PETS occupants within the project areas before proceeding. Plaintiffs maintain that such an inventory is mandated by the Court of Appeals' decision in *Martin.*

The instant motion for a temporary restraining order and preliminary injunction seeks to halt the on-going harvest of timber at these projects. As of December 23, 2003, no operations on the Wildhorse Creek Project were ongoing but Defendants stated that they might commence within the next two weeks. [Yelverton Decl. ¶ 6]. Currently, timber harvesting is occurring in the Oliver Branch Project. [Yelverton Decl. ¶ 4].

*Wildhorse Creek Project*

The Wildhorse Creek Project (LeFlore County, Oklahoma) was announced in Jan-

uary of 2002.[8] The project is located in Compartments 31, 32, 33, 35, 36, 37 and 38 of the Oklahoma Ranger District, Choctaw Unit. It includes 2,323 acres of preparatory thinning for uneven age timber management, 70 acres of single tree selection cutting, 148 acres of group selection/thinning, 218 acres of site preparation burn and chain saw felling, 404 acres of wildlife stand improvement/release and 4,883 acres of wildlife prescribed burn. In July 2002, the Forest Service prepared an EA, captioned "Environmental Assessment for Timber Harvest and Connected Actions." A "Biological Evaluation of Proposed Wildhorse Creek Timber Harvest" ("BE")[9] was prepared at the same time as part of the environmental assessment.

The BE listed each of the threatened, endangered, proposed and sensitive species (the sensitive species were drawn from the Regional Forester's sensitive species list) "known to occur within or near the Oklahoma Ranger District". Wildhorse Creek BE, at 2. These species included the red cockaded woodpecker, American burying beetle, bald eagle, Indiana bat, Diana fritillary (an insect/butterfly), and Bachman's sparrow. The BE noted that none of the mentioned species were known to be present "within the proposed project area based on known information" although suitable habitat for the American burying beetle, the Indiana bat, the Diana Fritillary, the Bachman's spar-

---

**8.** Apparently, it had been previously announced in 2000 but was delayed. The process started again in January 2002.

**9.** The biological evaluation was required not only by the FEIS, but also by the Forest Plan which requires the Forest Service to "perform biological evaluation on all projects to determine possible effects on threatened or endangered species, or on species proposed for such listing, or on sensitive species." *See* Forest Plan, IV–13. The Endangered Species Act also requires that "[e]ach Federal agency shall, . . . insure that any action authorized, funded,

or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, . . . to be critical." 16 U.S.C. § 1536(a)(2)(2000). Because the Forest Plan and the Endangered Species Act both require an evaluation of the effect of the project as a whole on protected species, the biological evaluation is not limited to the effect of proposed "vegetation management methods".

row, and the Ozark Chinquapin was noted to be present. *Id.* at 2–6. The BE contained the following relevant discussion:

1. **ABB** [American Burying Beetle]

This species is known to occur within the Choctaw, Kiamichi, and Tiak Units, but not known in the Broken Bow Unit. This species is not known to occur within the proposed project areas within the Compartments 31–33 and 35–38. The closest capture site is approximately 1 mile west of the proposed project location alongside Forest Road A22J. Throughout the proposed project area, habitat is similar to where they have been found elsewhere in the Ouachita Mountains.

Surveys for the ABB on the Oklahoma Ranger District began in 1992. On the Choctaw/Kiamichi Units, with over 3100 trapnights between 1992–2001, 12 ABBs have been captured at five locations. With approximately 136 trapnights between 1993–2001, eight ABBs have been trapped at four locations across the Tiak Unit. No ABBs have been captured on the Broken Bow Unit in surveys completed in 2000–2001 covering 102 nights. One survey has occurred within the proposed project area. In July 1999, a survey occurred within Compartment 31 (T4N, R24E, Section 36) with no ABBs being collected.

No new surveys have been completed for this project because it is assumed that this species occurs within the appropriate habitat on the Oklahoma Ranger District.

2. **Indiana Bat**

This species is known to occur within the Choctaw Unit, but is not known to occur within the Kiamichi, Broken Bow, or Tiak Units. This species is not known to occur within the proposed project areas, but suitable habitat exists within the proposed project area.

Glass and Ward (1959) first documented the Indiana bat in Oklahoma in two caves in Adair and Pushmataha Counties. Surveys for the Indiana Bat on the Oklahoma Ranger District began in 1989 with Saugey, et al (1990) finding seven hibernating Indiana Bats within Bear Den Caves at the west end of the Choctaw Unit. These caves have been surveyed several times since then, with seven Indiana Bats being found in 1991, one being found in 1993, and four in 1995. No Indiana Bats were found during winter surveys of 1997, 1999, and 2000. Summer surveys at Bear Den Caves by Caire (1986) and Clark and Clark (1997) did not find Indiana Bats. Additional summer surveys completed on the Tiak Unit (Clark and Clark, 1995), Choctaw Unit (Clark and Clark, 1995a), and Broken Bow Unit (Clark and Clark, 1997) did not find Indiana Bats. Claire (1986) did not find any Indiana Bats in his survey of 35 additional locations in Southeast Oklahoma.

No new surveys have been completed for this proposed project because the likelihood of detecting this species in a survey is small. This species is known to use Bear Den Caves during hibernation and is assumed to use the general forest area in that vicinity during spring and fall swarming periods.

\*     \*     \*     \*     \*     \*

4. **Diana Fritillary**

This species is known to occur within the Choctaw, Broken Bow, and Tiak Units. It is assumed to occur on the Kiamichi Unit because habitat within this unit is similar to the other units. It is not known to occur within the proposed project area but does have suitable habitat present.

This species is known from three locations on the Oklahoma Ranger District. One male Diana was seen alongside For-

est Road 6014 during the June 2001 breeding bird survey on the Choctaw Unit. One male Diana was seen alongside Forest Road 26000 adjacent to a regeneration area during the June 2001 breeding bird survey on the Broken Bow Unit. Two males were noted by Carpenter (1996) on a limestone glade on the Tiak Unit. With the exception of the work completed by Carpenter (1996), no other surveys have occurred on the Oklahoma Ranger District for this species.

No new surveys have been completed for this project because this species is known to occur within the Oklahoma Ranger District, Choctaw and Kiamichi Units within suitable habitat and additional surveys at this time would not provide any increased information for this analysis.

## 5. Bachman's Sparrow

This species is known to occur within the Choctaw and Broken Bow Units. It is not known to occur on the Kiamichi or Tiak Units. It is not known to occur within the proposed project areas but does have suitable habitat present.

The Oklahoma Department of Wildlife Conservation conducted a survey for Bachman's Sparrow at 10 locations on the Broken Bow, Choctaw, and Kiamichi Units during the spring/summer of 2001. Bachman's Sparrows were found at two locations on the Choctaw Unit and one location on the Broken Bow Unit, with a total of 13 individuals recorded. On the Choctaw Unit, seven sparrows were found within Compartment 49 and two were found within Compartment 84. None of the survey locations occurred within the proposed project area.

During the 1999 Mt. Herman breeding bird survey route, one singing male was recorded in a regeneration area alongside Forest Road 53150 in the Broken Bow Unit.

No Bachman's Sparrows have been recorded during landbird monitoring points conducted on the Choctaw, Kiamichi, or Tiak Units between 1996–2001 nor during the Ouachita breeding bird survey route on the Choctaw Unit over the past 10 years.

No new surveys were completed for this project because this species is known to occur on the Oklahoma Ranger District within suitable habitat, and the habitat requirements of the Bachman's Sparrow are well documented.

\* \* \* \* \* \*

## 12. Ozark Chinquapin

This species is known to occur within the Broken Bow, Choctaw, and Kiamichi Units but is not known to occur within the Tiak Unit. This species is not known to occur within the proposed project areas but suitable habitat exists.

Surveys conducted by Watson and Glenn (1992) and Tucker and Watson (1993) found five (5) locations of Ozark Chinquapin on the Kiamichi Unit. The Oklahoma Natural Heritage Inventory lists an additional five (5) locations of this species within LeFlore County, with one occurring on the Choctaw Unit and four (4) on private land. Elsewhere on the Oklahoma Ranger District, The Nature Conservancy (1996) found viable populations of this species within the upland areas of the Broken Bow Unit. No new surveys have been completed for this project because this species is known to occur within the Oklahoma Ranger District, suitable habitat is present within the proposed project areas, and additional surveys at this time would not provide any increased information for this analysis.

*Id.* at 7–11.

The BE then contained a discussion of the environmental baseline for each of the

evaluated species, noting the type of environment preferred by each of them. Then, the BE discussed the effects of the proposed management action on each of the evaluated species. That discussion, in part, stated the following:

**American Burying Beetle**

... the actual harvesting of trees by any method will have no effect on the ABB. When above ground, the ABB is mobile and able to escape the area of activity. Standard clauses are incorporated into timber sale contracts that protect the area from soil compaction, rutting, and minimize soil disturbance. Harvest locations are monitored to ensure that provisions of the timber sale contracts are being followed[.]

*     *     *     *     *     *

... ABBs have been found in all types of timbered areas, from bottomland hardwoods to mature pine forests, and in all age classes, but show a preference on the Oklahoma Ranger District for pine and pine/hardwood stands with a grassy understory.

*     *     *     *     *     *

The creation of low standard, intermittent service roads would not be expected to have any effect on the ABB. Upon harvest completion, these roads would be revegetated and still be available for use by the ABB.

*     *     *     *     *     *

**Indiana Bat**

Direct impacts to individuals or small groups of roosting bats may occur when trees are cut that harbor undetected roosts or as a result of the accidental felling of occupied snags, shagbark hickories, or damaged or hollow trees during timber harvest or site preparation. None of the areas proposed for timber harvest are located in hardwood or hardwood/pine forest types, which is the main habitat for these species. Because the timber harvest does not occur in

preferred habitat, this would be expected to reduce the impact to any roosting bats.

The likelihood of cutting a tree containing a maternity colony or individual roosting bat is extremely low (U.S. Fish and Wildlife Service, 1999). This is due to the large number of suitable roost trees present on the Oklahoma Ranger District, the rarity of these species within Oklahoma, the wide dispersal of Indiana Bats, Eastern Small-footed Bats, and maternity colonies throughout these species' range, and the fact that there have been no maternity colonies found in Oklahoma.

*     *     *     *     *     *

Due to the proposed prescribed burning being cool season burns while most bats are hibernating, direct bat mortality due to loss of roost trees would be minimized....

Indirect effects to these bat species could result from the felling of snags during the prescribed burn itself or from dozer activity pushing over a snag near the fireline. This would cause the snags to be taken away from potential use as roost sites. Additionally, on warmer days in late winter, prescribed burns have the potential to disturb bats from their roost trees. This would cause the bats to fly and use energy they would otherwise be conserving....

The proposed low standard, intermittent service road construction would have no effect on the Indiana Bat.... These bats are not known to rest beneath leaf litter or use the forest floor to where they would be directly impacted through temporary road construction....

*     *     *     *     *     *

**Ozark Chinquapin**

*     *     *     *     *     *

Ozark Chinquapin responds favorable [ sic ] to disturbance and reaches best development and fastest growth rates

where abundant sunlight reaches the forest floor. The U.S. Forest Service (1990) notes that field observations indicate that Ozark Chinquapin competes well with other tree species following disturbance from normal forest management practices. Thinning operations in themselves would not be expected to provide negative impacts to this species so long as Ozark Chinquapin stems are not directly cut. Thinning would be expected to promote the viability of Ozark Chinquapin due to the admittance of more light to plants that often survive in the form of suppressed sprouts. Group selection harvests likewise results in rapid release of chinquapin sprouts or roots that may have been dormant for many years.

\* \* \* \* \* \*

**Bachman's Sparrow**

.... Commercial thinning, single-tree selection, and wildlife stand improvement would be expected to promote increased grass, forb, and understory vegetation growth. This would move these standards towards more suitable Bachman's Sparrow habitat by providing open pine stands with increased herbaceous vegetation....

\* \* \* \* \* \*

The proposed low standard, intermittent service road construction could impact nesting Bachman's Sparrow should the road be created during the nesting season. Should a nesting Bachman's Sparrow occur within the proposed roadway, the potential exists for vehicles and equipment to damage or destroy the nest, eggs, and/or nestlings. Based upon existing stand conditions and rarity of the Bachman's Sparrow across southeastern Oklahoma, this would be expected to be a chance occurrence.

\* \* \* \* \* \*

**Diana Fritillary**

\* \* \* \* \* \*

Timber harvesting and prescribed burning would be expected to indirectly affect Diana Fritillaries through a change in vegetative composition and quantity. This would be expected to have a positive impact on the Diana Fritillary. Commercial thinning and prescribed burning would be expected to improve habitat conditions for this butterfly through providing increased nectar sources (Rudolph and Ely, 2000). Timber harvest would open the canopy and allow increased sunlight to reach the forest floor. This would result in increased nectar source growth. Prescribed burning would also be expected to increase the growth of herbaceous understory vegetation, including nectar sources....

*Id.* at 22–28.

The EA relied on the BE and found that no protected species were known to occur in the proposed project area. Further, if the American Burying Beetle and the Indiana Bat were present, the Wildhorse Project would have no adverse effect on them. If the Bachman's Sparrow, Diana Fritillary, and Ozark Chinquapin (sensitive species) were present, the project "may impact individuals but is not likely to cause a trend toward federal listing or a loss of viability". Wildhorse Creek EA, at 44.

In a Decision Notice and Finding of No Significant Impact made on July 26, 2002, the District Ranger for the Oklahoma Ranger District determined that the Wildhorse Creek Project should proceed. He determined that the project would have no significant impact on the quality of the human environment[10] and that it would not adversely affect protected species.

An appeal was filed by Joe Glen ("Glen"), apparently an individual affiliated

---

**10.** The National Environmental Protection Act, 42 U.S.C. § 4332(C)(ii), requires prepara-

with Plaintiffs in this case. *See* Glen Notice of Appeal (Aug. 2, 2002). The appeal claimed that the District Ranger had incorrectly determined that the project would have no adverse effects on the Ozark Chinquapin, and also claimed that the BE was deficient because it omitted a site specific population inventory for the Chinquapin. Glen claimed that this violated the requirements of the Ouachita Forest Plan and also the Forest Service Manual.

On September 9, 2002, the Ouachita Watch League also appealed the District Ranger's decision on a number of grounds, including that the Ouachita Forest Plan Amendment No. 31 was invalid because it was inconsistent with the 1990 Ouachita/Ozark FEIS which required site-specific, pre-project population inventory information for PETS. *See* Ouachita Watch League Notice of Appeal (Sept. 9, 2002).

On October 28, 2002, the Regional Forester issued written rulings in the Glen and the Ouachita Watch League appeals. *See* Regional Forester Appeal Decision (Oct. 28, 2002). In the Glen appeal, the Regional Forester noted that the Ozark Chinquapin was not known to occur within the proposed project area, though suitable habitat was known to exist within the project area; therefore, he would assume the presence of the Chinquapin in his analysis. The Regional Forester also stated that the Chinquapin's federal listing as a sensitive species was not because it is rare but rather because "most mature trees have been ravaged by Chestnut Blight disease". *Id.* at 3. He noted that the proposed thinning operations probably would promote the viability of the Chinquapin because more light would reach the forest floor.

He determined that these findings satisfied both Amendment 31 of the Ouachita Forest Plan and the requirements of the Forest Service Manual, as amended.

In the Ouachita Watch League appeal, the Regional Forester also determined by written decision of October 28, 2002 that the Wildhorse Creek Project should proceed. *See* Regional Forestor Ouachita Watch League Appeal Decision (Oct. 28, 2002). While he did not specifically address the Ouachita Watch League's claim that the BE failed to include a PETS inventory as required by the 1990 Ozark/Ouachita FEIS, he pointed to the finding in the BE that the project activities would improve habitat for a number of sensitive species, including the Ozark Chinquapin.

*Oliver Branch Project*

The Oliver Branch Project (Scott County, Arkansas) was announced in November 2001. This project is in Compartments 1262, 1263, 1274, 1288 and 1289 of the Poteau Ranger District. It includes timber harvest from approximately 362 acres of shelter wood and 2,099 acres of thinning. The project also includes wildlife stand improvement, including prescribed burning of forest understory on 5,329 acres and construction of 16 wildlife ponds.

In July 2002, the Forest Service prepared an EA titled "Oliver Branch Resource Management Project." A BE was also prepared as part of the EA. The BE contained the following relevant discussion:

### EVALUATED SPECIES SURVEY INFORMATION

#### a. Red-cockaded woodpecker

Historically, RCWs occurred in pine forests of numerous species, ranging in the

---

tion of an environmental impact statement when a proposed "major federal action" will significantly affect the quality of the human environment. Thus, a finding that a project will have "no significant impact on the quality of the human environment" means that preparation of an environmental impact statement is not necessary.

eastern U.S. from New Jersey south through Florida, and west from Missouri through Oklahoma and Texas (Hooper et al.1980). By the time RCWs were listed as endangered, suitable habitat had shrunk to 1% or less of its historic levels, with predictable declines in the numbers of birds (Conner et al.2001). Surveys in Arkansas in the 1970s and 1980s showed a population of at most a few hundred birds confined to public lands and scattered holdings of timber companies (James et al.1981). The population in the Ouachita National Forests represents the northernmost remaining RCWs in the U.S.

Red-cockaded woodpeckers have for many years occupied a cavity tree-cluster (CTC) in Compartment 1274, stand 9 (Poteau RD records, on file). In addition, there is an inactive CTC in compartment 1262. In addition to these CTCs, recruitment CTCs consisting of clusters of trees with artificial cavities have been established in five additional locations in order to provide cavities for dispersing young birds as well as to attract TCWs dispersing through the EMU as a result of translocations or intrapopulation reproduction.

The importance of these active as well as inactive and recruitment CTCs is illustrated by the situation in nearby compartment 1275, stand 39, which is immediately west of EMU at 15. At this CTC in 2002, an unbanded female nested with a male, using an artificial cavity. The origin of this unbanded bird isn't known, but it illustrates the value of the recruitment CTCs. EMU 15 has sufficient habitat to support 42 recruitment CTCs that could be installed under the proposed action.

Basic biological and population data about RCWs has appeared in many technical publications (Kulhavy et al.1995, Connor et al.2001). Included are data for the Ouachita NF and the Ouachita Mountains in Oklahoma (McCurtain County Wilderness Area). Basic survey data for Arkansas was summarized in James and Neal (1986, 1989).

The Poteau Ranger District has annually prepared a table that summarizes numbers of adults and nesting activity for the Ouachita NF since 1990. These data are on file and form the basis for the annual ONF monitoring report distributed to the public. In addition, an annual RCW report is prepared detailing all aspects of Ouachita NF efforts to recover the species. Both historic and current data exclusive to the Ouachita NF were presented by Neal and Montague (1991).

Also, since 1990, personnel working with RCWs on the Ouachita NF have made detailed daily field reports of activities associated with RCWs, including at least the following types of activities: surveys for cavity trees, maintenance and monitoring of cavity trees, banding and other activities associated with the nesting season, inspections during outbreaks of southern pine beetles. These field notes and copies of the annual reports are maintained at the Poteau RD office in Waldron, AR.

For more than a decade, Ouachita NF biologists on the Poteau, Cold Springs, and Mena Ranger Districts have worked in an educational capacity with other Forest Service personnel, groups like the Audubon Society, and interested individuals so that they can learn to identify RCWs and recognize RCW cavity trees. So, for example, when timber markers walk over large areas, they are also assisting in the effort to locate new, previously unidentified cavity trees. Additional surveys are not necessary to determine the presence of this species or to evaluate the effects of the proposed actions on this species.

## b. Indiana bat

The Indiana bat's life history and habitat requirements for both the active portion of the year and during hibernation are well known and succinctly summarized by Menzel et al. (2001). Mist net surveys and examination of abandoned mines for bat species on the Jessieville–Winona Ranger District, forest-wide, and on nearby lands have been extensive (Heath et al., 1986; Steward et al., 1986; Saugey et al., 1988; Saugey et al., 1989; Nelson et al., 1991; Saugey, unpublished data.) None of these investigations resulted in the captures of Indiana bats.

Indiana bats were discovered hibernating in Bear Den Caves in Eastern Oklahoma (Saugey et al., 1990), but have not been detected there during the breeding season (Clark and Clark, 1995a, 1995b, 1997). More recent investigations of the forest bat fauna include a long-term study on the Winona portion of the district in Phase III research areas being conducted by the U.S. Forest Service's Southern Forest Experiment Stations, based in Nacogdoches, Texas. Another study conducted during the summers of 2000/2001 by Henderson State University captured bats using ridge-top ponds and road ruts, specifically targeting detection of the Indiana bat. Neither of these studies resulted in the capture of Indiana bats (Perry and Thill, 2001; Tumlison 2001).

Amendment 31 (USDA–FS, 2000a) of the ALRMP (USDA–FD, 1990b) cited the Indiana bat as an example of a species that is assumed to occur in the project vicinity. Because there is only moderate likelihood of being able to detect this species, additional surveys would not provide definitive information for excluding the species from consideration in the project analysis.

## c. American burying beetle

The American burying beetle has been extensively surveyed on the Poteau and especially the adjoining Cold Springs Ranger District. Logan County is an historic county for this species and this species was documented in Scott County for the first time in 1992. During the period 1992–1996 there were 70 surveys for ABB on Poteau RD. Only 4 ABBs were captured in these surveys. In 1994–1995, there were 5 surveys for ABB within the boundary of EMU 15. No ABBs were captured in these efforts. Additional surveys are not necessary to determine the presence of this species or to evaluate the effects of the proposed actions on this species.

## d. Bald Eagle

During winter, bald eagles can be observed flying over many areas of Poteau RD, and they sometimes roost along the Fourche LaFave River and likely its tributaries. Bald eagles have also been sighted at chicken dumps located on private lands within Poteau RD (personal comm., K. Piles). They are present each winter (roughly November–March) at Lake Hinkle, outside EMU 15. They are also seen elsewhere on a casual basis. No winter roost site has been identified on Poteau RD and the low numbers seen provide no basis for speculating about the presence of a winter roost.

Bald eagles have nested since 2000 in T2N, R31W, S12, on a hillside near the Lake Hinkle dam. Both the nest site and the potential roost sites are outside EMU 15. No additional surveys are necessary to determine the presence of this species or to evaluate the effects of the proposed actions on this species.

### e. Bachman's sparrow

Bachman's Sparrow has been found in recent years during the nesting season in Compartment 1274, usually in areas managed for Red-cockaded Woodpeckers. Here it occurs in older pine stands maintained in an open condition with prescribed burning.

The natural history of Bachman's sparrow and its preferred habitats has been well documented. Bachman's sparrow populations have declined throughout its southern range in recent decades (De-Graaf et al., 1991; Hamel, 1992), however its viability as a species is not threatened at this time. Population declines may be directly related to declines in its preferred habitats that are early seral stage (losses due to changes in timber harvest methods—no regeneration harvests) and the lack of mature, open pine woodlands.

Bachman's sparrow forages on the ground in the dense grass or shrub habitat like that found in early forest stage cover. They glean insects, spiders and seeds in summer and seeds in the winter. This species belongs to the guild that is ground-nesting, herb gleaning insectivore-granivore. Key habitat requirements for breeding activity are dense grassy places where scattered trees or saplings are present usually in pine forest types. They use young pine plantations 1–3 years of age, and open pine stands with grasses and scattered shrubs, oaks or other hardwoods (see Arkansas nesting data in Haggerty 1998; also James and Neal 1986; De-Graaf et al.1991; Hamel 1992).

### f. Diana fritillary

The Diana fritillary butterfly has been extirpated over much of its historic range (NatureServe Website). In the literature, deciduous and upland pine woodlands near streams appear to be preferred habitat. Eggs are laid singly and haphazardly near various species of violets primarily in late summer. The larvae have been documented to feed on the leaves and flowers of violets (Carlton and Spencer 1996). Five of the eight species of violets in the state occur within the Ouachita Mountains and are found in a variety of moist to xeric habitats (Hunter 1988).

This species has been observed in various areas throughout Poteau Ranger District. Males have been found in abundance during 2002. Surveys on the Poteau Ranger District by Rudolph (ongoing and unpublished) indicate this species to be abundant in Management Area 22 where timber thinning, WSI, and repeated prescribe [*sic*] burning has occurred. No new surveys are required for the proposed project because this species is known to occur within the Poteau Ranger District, suitable habitat is present within the proposed project areas, and additional surveys at this time would not provide any increased information for this analysis.

\*   \*   \*   \*   \*   \*

## ENVIRONMENTAL BASELINE FOR THE SPECIES EVALUATED IN THIS BE

### a. Red-cockaded woodpecker

The Red-cockaded woodpecker (RCW) was listed as Federally endangered in 1970. This listing followed the widespread and near total loss of its habitat in the southeastern U.S. RCW habitat is characterized by park-like stands of mature pines maintained in an open condition by periodic fire. These fires reduced competition from smaller pines and hardwood trees, and fostered a diverse understory of native grasses and forbs. (Conner et al.2001). This habitat is termed a "pine-grassland."

RCWs are unique in their habit of excavating roost and nest cavities in live,

mature, pines (Ligon 1970). These pines usually exhibit heartwood decay caused by the redheart fungus (Connor and Locke 1982). The birds excavate through the hard, resinous sapwood to reach the softer heartwood, where they then excavate a chamber. Shortleaf pine (Pinus echinada) is the species that occurs naturally in the Ouachitas. Matton (1995) found that the mean age of the pines in the Ouachitas with heartwood was 110 years. In Texas, RCWs preferentially chose the oldest available shortleaf pines for cavity excavation, typically in the range of 105 years (Connor and Rudolph 1991).

Two critical ecological factors affected the suitability of the Ouachita NF for RCWs: First, the original high-quality pine stands of what is today the Ouachita NF were heavily cutover by private interests primarily during the period 1906–1950 (Smith 1986). Therefore, almost all of the Ouachita NF today consists of second-growth shortleaf pines and mixed species of hardwoods. Older stands in this second growth forest are in the 50–90 years range. Even though this forest contains relatively large acreages of maturing forest, it is just reaching the lower threshold age suitable for redheart development and useful to RCWs for cavity excavation. Second, long term fire suppression has resulted in the loss of structurally open stands. Most stands in the Ouachita NF have stocking rates or hardwoods well above historical levels. There is a natural reason for this. Shortleaf pines will not reproduce under shade. With no fire in the ecosystem, gaps created by the death of older larger shortleaf pines are filled by midstory hardwoods (Guldin 1986). The loss of open pine stands and the advance of hardwood stocking rates following fire suppression has been carefully studied in the Oklahoma Ouachitas (Kreiter 1995).

RCWs initially declined due to widespread and near total removal of mature pines. This was followed by wildfire suppression programs that caused additional, negative changes in RCW habitat. The result was that the birds were completely extirpated from much of their historic range. While RCWs have declined throughout their range, the declines have not been universal. Indeed, a handful of local populations are stable, and a few are growing (Escano 1995). Population growth is occurring primarily on public lands where habitat restoration is underway and where techniques including use of artificial cavities are being used (Copeyon 1990, Allen 1991). However, even on public lands where recovery efforts are underway, there are critical problems.

Mature pine trees are an economically valuable resource. The fact that RCWs require large areas of mature pines means that their ecological needs often conflict with the economic targets of private landowners (Costa 1995). Since National Forest lands are managed under provisions of the National Environmental Policy Act, economic targets are only one of several in a mix of goals that affect long term land management policies.

Habitat restoration outlined in the Region 8 EIS for RCW recovery (USFS 1995) requires use of standard forest management tools including thinning, midstory reduction, and prescribed burning to provide pine-grassland habitat suitable for RCW recovery. Thinning involves the removal of a portion of the mature tree basal area. This is usually done commercially, through timber sales. Part of the revenues from these sales can be returned to the affected landscape for wildlife enhancements through the Knutsen–Vandenberg (KV) Act. KV funds can then be used to fi-

nance habitat restoration activities, including installation of artificial cavities, and other work that directly advances the RCW recovery goals set in the Region 8 EIS.

The Ouachita NF has responded to RCW recovery needs through creation of Management Area 22 (USFS 1996). This pine-bluestem grass project area encompasses 155,000 acres, primarily in Scott County, AR, and includes parts of the Poteau, Cold Springs, and Mena ranger districts. While much more of this pine-grassland habitat exists in the Ouachita NF, MA 22 area is deemed large and contiguous enough to encompass a fully recovered population of RCWs. It is here the Ouachita NF is concentrating its primary efforts towards RCW management in compliance with the Region 8 EIS. These efforts include the already described habitat restoration activities, prescribed burning, translocations of adult RCWs to the Ouachitas from designated donor populations, installation of artificial cavities, and maintenance of existing cavities.

The RCW population, which had been in a long decline, hit an historic low point in the mid-to late 1990s, but has grown steadily since. The number of active territories in 1990 (n=13) had doubled by 2002 (n=27). The number of nesting attempts went from 12 to 24. The estimated number of fledglings (based upon banding) went from 10 in 1990 to 40 in 2001 (data on file).

### b. Indiana bat

Spring, summer and fall roosting habitat for this species has primarily occurred as snags with exfoliating bark, or living trees that have exfoliating bark, the shagbark hickory in particular. It has also been found in live Virginia and shortleaf pines in Kentucky and Indiana, and additional species are being added as studies continue (Menzel et al., 2001).

Many of the snags used by this bat have been of species found throughout much of the Ouachita NF and include red, white and post oaks. Although estimates of size of roost trees is quite variable, Kurta et al., (1996) found the average diameter of roost trees to be between 30–52 centimeters (cm) (11–20 inches), and that roost tree diameter was significantly less variable than the diameter of random trees. Trees of this diameter range are found in timber stands designated to contain immature sawtimber and sawtimber-sized trees. There are thousands of acres of hardwood and pine forest type that fit these categories and have the potential to contain snags of appropriate size and species. There are no threats to the Indiana bat from the proposed project.

### c. American burying beetle

The ABB appears to [*sic*] a habitat generalist with a slight preference for grasslands (grasses and forbs) and forested areas with little to no midstory. Considering the broad geographic range formerly occupied by the beetle, it is unlikely that vegetation or soil type were historically limiting (Nebraska Game and Parks Commission, 1995; Hedrick 1993). Carrion availability, and not habitat, may be the greatest factor determining where the species can survive (USDI–USFWS, 1995). The preference of this insect for areas of grasses and forbs (as would be found in early seral habitats, open pine or hardwood woodlands) is not unexpected since the largest populations of small rodents and birds occur in these areas and their carcasses afford the beetle egg laying/brood rearing habitat (Hedrick 1993).

Management actions proposed for the EMU occur over a small portion of the district and the extent and area(s) of

occurrence of ABBs are unpredictable. Thousands of acres of similar habitat containing forbs and grasses are available for use by this species, both on district and over the entire Forest. Quite possibly the greatest limiting factor and threat to the viability of the ABB may be a lack of events or management actions on the landscape that set back or maintain conditions with abundant grasses, forbs, rodents and small birds. There are no known threats to this species from harvest operations but road building and other activities could cause incidental take of this species. (USDI–USFWS, 1994).

### d. Bald eagle

Bald eagles have made a steady comeback from population lows, which allowed them to be downlisted from endangered to threatened. They are now seen casually as they fly over many places in the district, but especially around Lake Hinkle in winter, as well as smaller watershed lakes on the district. They occur on only a casual basis within EMU 15. The proposed action will have no direct, indirect, or cumulative effects on this bird, especially since the riparian areas where it is usually found are excluded from all activities except for prescribed fire, which poses no threat to this species.

### e. Bachman's sparrow

Suitable open forest habitat does exist currently within the EMU, primarily in areas managed for Red-cockaded woodpeckers. Within the district, Bachman's sparrow is most likely to be found in or near pine stands in Management Area 22 that have brushy or grassy understories and limited midstories beneath a sparse canopy (not exceeding 70 BA) or where most overstories have been removed. They are also found in pine regeneration areas that have had a pre-commercial thin treatment followed by burning. They occur regularly in summer in an old seedtree area with an RCW cluster (compartment 1244) where the regeneration has had a precommercial thinning and burning. Most recently, they were found along the Waldron Breeding Survey route on the Cold Springs Ranger District in a recent seedtree harvest area. There are no identified threats or limiting factors expected as a result of implementation of the Proposed Action.

During the early part of this century, vegetation in the Ouachita Mountains was converted from being 90% old growth to 90% earlier seral stage conditions as man harvested timber and burned this region. The forest restablished [sic] itself and underwent another period when excessive harvesting again created an abundance of early forest stage cover conditions. This last period extended from about 1960 through 1990 when clearcut harvests were limited to special situations. What the Bachman's sparrow population response to these earlier harvests may have been is unknown, as was the population level prior to the most recent era of clearcut harvesting. However, enough is known of Bachman's sparrow life history to surmise that the populatiuon [sic] has gone up and down as it tracks changes in forest conditions. Now, more than a decade after the last clearcut harvest, virtually every stand of early forest stage cover habitat has experienced crown closure and no longer provides suitable habitat. In addition, harvests in older stands have diminished with fewer acres offering canopied, but open conditions with appropriate forest floor cover.

Prescribed burning on the Poteau RD regularly includes pine regeneration areas, and these are included in the pro-

posed actions. In this watershed in the future, Bachman's sparrow will most likely be found in such areas and mature forest stands that have been treated (timber harvest, WSI Midstory, temporary openings) and have developed a herbaceous and brushy understory beneath a sparse canopy. There are no identifiable threats or limiting factors expected as a result of implementation of the Proposed Project.

### f. Diana's fritillary

Surveys conducted in the early 1990's found the butterfly present in nine counties in western Arkansas usually associated with disturbed habitat or natural prairies. During 1998 and 1999, extensive surveys by Dr. Matthew Moran of Hendrix College added nine additional counties indicating the species to be more widespread than previously thought. Moran's observations were that "only two nectar plants are commonly utilized by Diana fritillary adults, buttonbush ( Cephalanthus occidentalis ) and purple coneflower (Echinacea purpurea )." Moran also suggested that the relative scarcity of the butterfly may be related to its need for high quality nectar plants that have become more rare as prairies and wetlands have been diminished (Moran and Baldridge 2001). Observations by Rudolph and Ely (2000a) working on the Poteau Ranger District suggest that shortleaf pine-bluestem habitat maintained by frequent fire and midstory removal along with other openings (roads, glades, ridges) are the principle habitats used by adults because they harbor abundant nectar sources. These researchers from the U.S. Forest Service's Southern Research Station found Diana fritillaries were detected significantly more often in pine-bluestem restoration plots during the first and second growing season post-burn than on control or treatment plots during the third growing season post-burn. Detection of adults was highest during this period when nectar resources were most abundant.

Rudolph and Ely (2000b) also reported that flower abundance in east Texas pine forests increased with increasing change in vegetation structure due to prescribed fire. These flowers were not only more abundant, but were composed of herbaceous species most frequently used as nectar sources by adult butterflies. In forests where fire had less impact, flower abundance was much reduced presumably due to the encroachment of woody vegetation in both the midstory and understory. The pattern of nectar source availability also reflected the abundance and species composition of the butterfly communities. The well-burned, pine-dominated forests supported more individuals and a different taxonomic array than unburned forests. In forested stands where repeated fire or short return times (3–5 years) occurred, fire had a major impact. Additional surveys are not needed to provide more definitive information to improve the determination of effects to this sensitive species.

Information on past population levels of this species are unknown and true habitat affinities in the Ouachita Mountains are yet to be fully established other than this butterfly is attracted to sources of high quality nectar. Nectar producing plants may occur anywhere within the project area, but are likely to be most abundant in stands where timber harvest and/or other silvicultural activities have occurred that allow additional sunlight on the forest floor encouraging herbaceous plant growth. It has been suggested that this species may have declined in the interior highlands due to alteration of the fire regime and resulting loss of abundant nectar resources

(Rudolph 2001). There are no threats or limiting factors associated with the Proposed Action for this species of insect.

\* \* \* \* \* \*

## EFFECT OF PROPOSED MANAGEMENT ACTION ON EACH SPECIES EVALUATED

### a. Red-cockaded Woodpecker

Timber harvest, midstory reduction, and prescribed burning are silvicultural tools used to restore open pine-grassland habitat. Mature pine trees are abundant within the watershed. Removal of mature pines in the harvest phase will improve habitat for RCWs by reducing pine basal areas and improving growth potential for the residual stand.

The direct effects associated with timber harvest, wildlife stand improvement (WSI-midstory reduction), and burning will be to improve the habitat for RCWs plus other plants and animals associated with open, park-like forests dominated by mature pines, including a dominant and codominant component of mature hardwoods, and understories with native grasses, forbs, and legumes. Mature pine trees remaining after thinning will be suitable for installation of artificial cavities. Scattered relict trees will provide opportunities for natural cavity excavations.

Indirect effects will primarily involve benefits to other species native to pine-grassland habitats. The wider spacing of residual trees will encourage proliferation of herbaceous and shrubby ground cover (Masters and Wilson 1994, Tables 1–4) and the probability of enhanced insect populations, such as Diana fritillary (Craig Rudolph, personal communication). Areas of reduced clutter resulting from burning will enhance foraging activity for species requiring bare ground within the forest. Plants that exist in a suppressed condition as a result of fire exclusion will be released (Masters and Wilson 1994, Table 2). The increased diversity of plants will benefit other birds (Wilson et al.1995) and mammals (Masters et al.1998).

Cumulative effects of the treatments will be to enhance conditions for a broad range of plants and animals across the watershed. This includes opportunities to add 42 RCW recruitment clusters needed to continue recovery efforts within MA 22. Since RCWs are a social species, providing opportunities for growth within this watershed will strengthen efforts elsewhere within MA 22.

### b. Indiana bat

*Timber Harvest and Reforestation:* The **direct** effect of the proposed commercial timber harvest of pine trees (which are considered Class II roost trees) would be the removal of possible roost trees of Indiana bats. During any timber harvest operation the likelihood of cutting a tree containing a maternity colony or individual roosting Indiana bat is anticipated to be extremely low. This is due to the large number of suitable roost trees present on the ONF, the rarity of this bat species, the wide dispersal of Indiana bats and maternity colonies throughout the species' range, and the fact that there have been no maternity colonies found in Oklahoma or Arkansas on the ONF or other public or private lands in these two states (USDI–USFWS, 1999b). Primary roost trees (Class I) would be protected by contract clauses that protect den trees and snags during timber harvest and site preparation. Another direct effect of timber harvest of pine trees will be to immediately provide more open foraging conditions that may prove beneficial to this species that has been known to forage and roost in areas of canopy gaps, open

areas with snags, stands that had been heavily logged 20 years earlier, and where selective harvesting had been recently employed (Menzel et al., 2001). The **indirect** effects of pine harvest (and site preparation of 119 acres by burning) will be to remove some shaded conditions that would potentially allow an increase in forest floor vegetation, and consequently increase the insect population numbers and diversity (prey items) within this EMU, and increased growth opportunities for hardwood species within the stands that could offer future roosting opportunities. **Cumulative effects** of pine harvest will depend upon the extent of forest canopy remaining and the number of natural or created snags in the area. Because this bat preferentially uses snags of hardwood species, the harvesting of pines would have little impact on roost availability, but could enhance the availability of insect prey.

*Timber stand improvement:* Hand tool release will have no **direct** or **indirect** effect on the Indiana bat because only woody species of a small size will be cut down or burned. Pre-commercial thinning will occur in areas that are not suitable habitat for this species at this time. In time, the **cumulative** effect will be to bring these acres into a condition that will make them suitable habitat for the Indiana bat.

*Wildlife Treatments:* Prescribed burning will have no **direct** effect on the Indiana bat due to burning parameters that protect most large trees from fire kill. **Indirectly**, proposed burns could allow an increase in forest floor vegetation, and consequently increase the insect population numbers and diversity (prey items) within this EMU. These burns will be only part of the prescribed burns on the Ouachita National Forest in the years that they occur. The cumulative total of the burns in these given years will not exceed the levels listed for the Ouachita NF in the Biological Opinion for this species.

Indiana bat roosts have been commonly found among mixed mesophytic hardwood and hardwood-pine habitat types while others have been located in riparian and upland habitat and on occasion in pine dominated forests (Menzel et al., 2001). An indirect and cumulative effect of thinning and midstory reduction would be increased growth opportunities for remaining hardwood species within the stand that could offer future roosting opportunities. Construction of woodland ponds will assure year-round source of non-flowing water. Many insects that are in turn eaten by bats use such ponds. Temporary wildlife openings and road construction will have short term indirect effects similar to those of small gaps discussed in timber harvest.

*Road Construction, Reconstruction, and Maintenance:* The **direct** effects of road construction would be the slim possibility of cutting down a roost tree along the road clearing limits. **Indirectly** and **cumulatively**, a few acres of potential habitat for this species would be lost.

Considering all proposed activities in combination in the Proposed Action for EMU 15, there is a slight possibility of adverse direct effects on the Indiana bat. Indirect effects and cumulative effects would be positive.

This project cumulatively with other similar projects on the Ouachita will not exceed the acreages list in the BO.

### c. American burying beetle

*Timber Harvest and Reforestation:* Timber harvest of any kind is not thought to harm this endangered species. The ground disturbances or vehicle uses associated with logging such as

log decks (1/4 to 1/2 acre in size each) and temporary road construction and skid trails could result in crushing or exposing breeding beetles or their larvae or could disturb individuals if the species is over-wintering. Fireline construction for site prep burning would have these same ground disturbance effects. The **direct** effect to this species is anticipated to be extremely low due to the wide dispersal and low numbers of ABB throughout Poteau Ranger District.

*Timber stand improvement:* Hand tool release and pre-commercial thinning should have no **direct** effect to this species. Long term, the stands treated should become suitable ABB habitat quicker with the treatments.

*Wildlife Treatments:* Most prescribed burning would occur during the ABB non-activity period; this would have no **direct** effect on the ABB. Firelines for wildlife burning would have the same **direct** effects as temporary road construction listed above. **Indirectly**, prescribed burns will allow an increase in forest floor vegetation, and consequently increase in the numbers and diversity of carrion possibilities within this EMU. Midstory reduction (Wildlife Stand Improvement treatment) would have no **direct** effect on the ABB and would have similar **indirect** and **cumulative** effects as TSI. Construction of woodland ponds could have the same **direct** effects as other types of ground disturbance listed above. These ponds are less than an acre in size and work is done whenever possible during the ABB over-wintering period.

*Road Construction, Reconstruction and Maintenance:* The **direct** effects of road construction would be heavy equipment could crush or expose nesting beetles if it is breeding season or could disturb individuals if the species is over-wintering. If road construction must occur

between March 15 and October 15, ABB will be baited out of the road impact area before and during construction (**modification** to BO by FWS Vicksburg Office, 4/27/98). **Indirectly** and **cumulatively**, only a few acres of habitat for this species would be lost: basically, the graveled road corridor for 1.9 miles in a project area of over 8,000 acres that will remain forested and only temporarily disturbed.

Considering all proposed activities in combination in the Proposed Action for EMU 15, there is a slight possibility of adverse direct effects on the American burying beetle. Indirect effects and cumulative effects would be positive. All Reasonable and Prudent Measures listed in the Biological Opinion for this species will be followed.

#### d. Bald eagle

The proposed action will have no direct, indirect, or cumulative effects on this bird, primarily because riparian corridors are exluded [ *sic* ] from all proposed activities except for prescribed fire. Fires in riparian zones are unlikely to develop intensities that would kill large roost trees, if present. Fire would also be unlikely to harm this highly mobile species.

#### e. Bachman's sparrow

Timber harvest, site preparation, pre-commercial thinning, release and WSI midstory reduction in pine stands will not have direct effects on this bird. Indirect effects of forest canopy reduction or removal will include increased levels of herbaceous and shrubby growth as additional sunlight reaches the forest floor. Increased numbers and species of plants will translate into additional fruit, seed and insect availability. Cumulative effects will be to provide additional nest-

ing and foraging habitat throughout the watershed for this species for the foreseeable future (10 years). Many scientists consider early forest stage cover to be critical for many species (including this bird) and ecosystem health (Askins 2001; Hunter et al.2001; Livaitis 2001; Lorimer 2001; Trani et al 2001).

Prescribed fire will have no direct effects on this sparrow because most burns will occur during the non-nesting period of the year. Indirect effects of prescribed fire will be to encourage the growth of herbaceous species, particularly in areas where silvicultural activities have preceeded [sic] the burn and resulted in a reduced or removed forest canopy. In some instances, prescribed fire will temporarily reduce the volume of herbaceous material present for at least one growing season and thereby limit the area's usefulness for nesting, but not for foraging. Cumulative effects will be to provide a dynamic habitat mosaic within the watershed where different stages of herbaceous cover will be available for nesting and/or foraging beyond the life of the proposed project, but not as a long-term habitat improvement. Suitable habitat will be available for approximately 10 years.

\*　　\*　　\*　　\*　　\*　　\*

## DETERMINATION OF EFFECTS

### a. Red-cockaded woodpecker

The proposed Project is "not likely to adversely affect" the Red-cockaded woodpecker. Proposed habitat work is compatible with the goals of MA 22 and should promote RCW population growth.

### b. Indiana bat

The proposed project is "not likely to adversely affect" the Indiana bat. US Fish and Wildlife Service concurred with this determination by their Biological Opinion, 1999–provided the Forest stays

within the acre limitations listed for each activity in the BO. This project, cumulatively with other similar projects on the Ouachita, will not exceed acreages listed in the BO.

### c. American burying beetle

The Proposed Project is "not likely to adversely affect" the American burying beetle. This determination was concurred with by the Biological Opinion (1994) provided Reasonable and Prudent Measures were followed; however, a paragraph not requiring further consultation was NOT in the BO. USDI Fish and Wildlife Service concurrence with this determination is required and requested. **(DN for this project will not be signed until this concurrence is received).**

### d. Bald eagle

The Proposed Project is "not likely to adversely affect" the Bald eagle. The only known nest site is well outside EMU 15, no winter roost sites are known in the area, and nothing proposed will interfere with activities in the riparian areas where these birds are usually found.

### e. Bachman's sparrow

The Proposed Project will have "beneficial impacts" upon this bird.

### f. Diana fritillary

The Proposed Project will have "beneficial impacts" upon this butterfly.

\*　　\*　　\*　　\*　　\*　　\*

## MITIGATION MEASURES

### Red-cockaded woodpecker

- All existing roost and nest trees would be protected during timber harvest and prescribed burning.

- No harvest operations would occur near active RCW clusters during the RCW nesting season (approximately mid-April to late June).

**Indiana bat**

**Mitigation Measures for Indiana Bat in Timber Harvest Areas**

- Den trees and snags would be protected during timber harvest and site preparation
- Snags will be created if necessary
- Den tree clumps at 1/2 acre per 20 acres would remain in regeneration stands

**American burying beetle**

**Mitigating measures for construction and reconstruction of Level D Roads that apply to the ABB:**

- When possible road building and reconstruction that moves or enlarges the roadbed will occur during cooler months when the ABB is less active.
- If activities must occur between March 15 and October 15, ABB will be baited out of the road impact area before and during construction. This modification to BO by FWS Vicksburg Office, 4/27/98.

**Bald eagle**

- No special mitigation measures necessary for this species.

**Bachman's sparrow**

- No special mitigation necessary for this species.

**Diana fritillary**

- No special mitigation necessary for this species.

*Id.* at 14–44.

The District Ranger for the Poteau Ranger District issued a Decision Notice on July 18, 2002, finding that the Oliver Branch Project would have no significant impact on the quality of the human environment. He also found, quoting the findings of the BE, that the project was not likely to adversely affect the red cockaded woodpecker, which was known to occupy the project area. He noted that the American burying beetle was not found in the project area, although it had been found in low numbers in neighboring counties; in any event, the proposed project would not adversely affect the beetle if present. Similarly, he found that the bald eagle was not known to exist within the project area, although a bald eagle nest had been found on Lake Hinkle (apparently a nearby lake) in 2002; further, the bald eagle would not be adversely affected by the project activities. He found that the Indiana bat had never been located in the proposed project area and that "summer surveys in the Ouachita have failed to locate any individuals" though the bats appeared to be breeding in the Ozark Mountains in Arkansas; thus, he classified the Indiana bat as a possible resident of the project area but found that the project activities would not harm the bat if it was present. He found that the project would likely have a beneficial effect on the Bachman's Sparrow and the Diana fritillary, which were known to be located in the project area.

An appeal was filed by Plaintiff Forest Conservation Council ("FCC") and also by Jerry Williams ("Williams"). *See* FCC/Williams Notice of Appeal (Aug. 29, 2002). The appeal made a number of claims, including that the Forest Service had improperly failed to obtain site-specific population inventory information with respect to protected species. The appeal also claimed that the District Ranger had incorrectly determined that the project activities would not adversely affect the viability of the protected species in the area.

The Regional Forester issued his written decision in the appeal on October 15, 2002, determining that the project should proceed. *See* Regional Forestor FCC/Williams Appeal Decision (Oct. 15, 2002). At this time Amendment 31 to the Forest Plan was effective, but not the 2002 Supplement to the 1990 FEIS which changed the wording of the PETS data collection requirement. The Regional Forester quoted the BE and determined that there was sufficient "base line, site specific, survey information for PETS species in the project area". Oliver Branch Decision Notice, at 5. He rejected appellant's claims that the District Ranger had incorrectly determined that project activities would not adversely affect protected species.

The Court now turns to the evaluation of Plaintiffs' request for a restraining order or preliminary injunction as to the Wildhorse Creek and Oliver Branch timber harvest projects.

## II. *Applicable Law*

■ In order to obtain an injunction in this case, Plaintiffs must show (1) a substantial likelihood that they will ultimately prevail on the merits; (2) that they will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to them outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest. *Zardui–Quintana v. Richard*, 768 F.2d 1213, 1216 (11th Cir.1985). A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites. *Id.*

It is important to note that while Plaintiffs are seeking equitable relief in the instant Motion, the Court's review of the Forest Service's action will be a limited one. Under the APA, the Court must employ the arbitrary and capricious standard, meaning that the Forest Service's action will only be reversed if found to be "arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000). The Court has employed this standard of review within its evaluation of whether Plaintiffs have a substantial likelihood of success on the merits, the first prong of the test for injunctive relief.

## III. *Plaintiffs' Arguments*

Plaintiffs argue that Amendment 31 to the Ouachita Forest Plan is invalid because it conflicted with the PETS data collection provisions of the 1990 FEIS, which was still in effect when Amendment 31 was issued. An implicit, though unarticulated part of Plaintiffs' argument is that the Wildhorse and Oliver Branch Projects would not be allowable under the 1990 FEIS and the 1990 Ouachita Forest Plan prior to Amendment 31 in 2000 because the Forest Service failed to collect the necessary PETS data per these directives. Thus, Plaintiffs implicitly argue that the Court of Appeals' decision in *Martin* in 1999 would mandate disapproval of the Wildhorse and Oliver Branch Projects even before Amendment 31. The Defendants, on the other hand, argue that Amendment 31 is not a significant change to the 1990 Ouachita Forest Plan but only a clarification of the Forest Service's view of what data applicable law requires, thereby suggesting that Amendment 31 was not outcome determinative in this case.

## IV. *Analysis*

■ In analyzing whether Plaintiffs have a substantial likelihood of success on the merits, the Court believes Plaintiffs may read too much into the Court of Appeals' decision in *Martin*. *Martin* held

that the Forest Service's decision to approve certain timber sales in the Chattahoochee National Forest was arbitrary and capricious because the site-specific biological evaluation was deficient. The evaluation was deficient because of the lack of "adequate population inventory information" for PETS species, when the project site had "high potential for occupancy by a PETS species". *Martin* 168 F.3d at 5. The opinion noted the Forest Service's wholesale failure to collect population inventory information or population data for the PETS species inhabiting the Chattahoochee National Forest, coupled with the Forest Service's admission that there was a high probability of PETS species in the project area. *Id.* The Court did not specifically state, though it may have implied, that the Forest Service was required to conduct a head count of each protected species in the proposed project area in order to fulfill the Forest Plan's requirement of "adequate population inventory information". In this case, Plaintiffs have not articulated whether they contend that this was the Court's holding. Instead, they seem to suggest that this case, like *Martin*, involves a wholesale failure to collect PETS inventory information, but they do not spell out the details of that wholesale failure, at least not in the briefs filed in support of the instant Motion.

The Court of Appeals in *Martin* did not have occasion to construe the meaning of the term "adequate population inventory information" which is contained in the 1990 FEIS and the 1990 Forest Plan. This ter-

minology, in the Court's opinion, is not totally self-explanatory. For one thing, it is unclear whether "inventory information" is different from "inventory". Does "inventory information" require a head count? In addition, it is not entirely clear what the word "adequate" is intended to mean. The question which arises is: adequate for what purpose?

Plaintiffs make other arguments in support of the instant motion, but these need not be addressed inasmuch as they are all derivative of the outcome of Plaintiff's first argument. Specifically, Plaintiffs argue that Amendment 31 was analyzed under an inadequate Environmental Assessment. Plaintiffs also contend that Amendment 31 was a significant amendment, which required the preparation of an Environmental Impact Statement instead of just an Environmental Assessment. Plaintiffs argue that the 2002 Supplement to the 1990 FEIS was invalid because it did not contain sufficient information to inform the public of the action being taken, and that it improperly failed to include analysis of the 2002 amendment to the Forest Service Manual for the Southern Region. Finally, Plaintiffs emphasize that the 1990 FEIS pertaining to vegetation management was an overarching document which dictated inclusion of the PETS data collection requirement in the language set forth in the 1990 FEIS, such that the Ouachita National Forest Plan could not alter its PETS data collection language without first amending the 1990 FEIS.[11]

---

11. Plaintiffs primarily focus on this latter claim in the instant Motion. However, the Court notes that while this claim is based on NEPA in that it alleges that mitigation measures, in the form of collection of PETS data, which were adopted in the FEIS and recorded in its accompanying ROD, were not enforced and that such action is thus arbitrary and capricious, the primary thrust of this claim necessarily involves an assessment of the *Martin* court's NFMA holding. Even if the FEIS must have been supplemented in accordance with NEPA regulations, in order for Amendment 31 to be valid, Plaintiffs may not prevail because they have not demonstrated to this Court that Defendants failed to collect "adequate population inventory information" even under the pre-amendment PETS collection requirement.

### V. *Conclusion*

In summary, at this point Plaintiffs have not shown a substantial likelihood that they will ultimately prevail on the merits of their claims.[12] For that reason, Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction [# 33] is DENIED.

12. Because Plaintiffs have failed on this prong, the Court need not examine the remainder of the test for injunctive relief.